

# NUMBER 13-18-00377-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ESEQUIEL (CHEQUE) DE LA PAZ,                                    Appellant,

v.

OFELIA (OFIE) GUTIERREZ,                                          Appellee.

## On appeal from the 105th District Court
## of Kleberg County, Texas.

# MEMORANDUM OPINION

## Before Chief Justice Valdez and Justices Hinojosa and Wittig[1]
## Memorandum Opinion by Justice Hinojosa

This is an accelerated appeal from a final judgment voiding the results of the 2018

Democratic Primary Runoff Election for Justice of the Peace, Precinct 4, Kleberg County,

---

[1] Retired Fourteenth Court of Appeals Justice Don Wittig, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN. § 74.003 (West, Westlaw through 2017 1st C.S.).

Texas (the Precinct 4 JP runoff race). Before being voided, the election results provided that appellant Esequiel "Cheque" De La Paz prevailed over appellee Ofelia "Ofie" Gutierrez by six votes. Esequiel's[2] two issues, as we construe them, contend that (1) the election code required Gutierrez, as the contestant in the trial court, to present evidence that each illegal voter voted in the Precinct 4 JP runoff race as opposed to voting in only the two other races on the Democratic runoff ballot in Kleberg County, and (2) whether the evidence supporting the trial court's judgment is legally or factually insufficient. We affirm.

## I. BACKGROUND

Both Esequiel, the twenty-four-year incumbent, and Gutierrez, the challenger, qualified for the Precinct 4 JP runoff race. The May 22, 2018 Democratic primary runoff ballot in Kleberg County on which the Precinct 4 JP runoff race appeared included two other races—the race for Governor of Texas and the race for Commissioner, Precinct 4, Kleberg County. Esequiel prevailed over Gutierrez in the final canvass by 318 to 312 votes. The Democratic Party Chair of Kleberg County declared Esequiel the winner, and Gutierrez filed a petition for election contest.

Gutierrez generally asserted that several of Esequiel's family members illegally voted in the Precinct 4 JP runoff race because they did not reside at the addresses indicated on their voter registration applications. Several of Esequiel's family members testified at the bench trial. *See* TEX. ELEC. CODE ANN. § 231.005 (West, Westlaw through

---

[2] As explained below, several of the witnesses share Esequiel "Cheque" De La Paz's surname. We will refer to appellant by his first name for clarity.

2017 1st C.S.) ("The district judge shall decide the issues of fact in an election contest without a jury."). Gutierrez introduced and the trial court admitted approximately 185 exhibits. These exhibits included voter registration applications and property appraisal information from the Kleberg County Appraisal District relating to several of Esequiel's family members.

In its final judgment, the trial court pronounced that by clear and convincing evidence seven individuals did not reside in Precinct 4 and thus their votes were illegal. Esequiel requested findings of fact and conclusions of law, and Gutierrez filed proposed findings and conclusion. Esequiel objected to Gutierrez's filing, arguing:

> . . . While the proposed findings and conclusions arguably set out the facts and properly state the relevant law, they do not apply the law to the facts. Hence, there are no conclusions of law in the Proposed Findings and Conclusions.
>
> "The primary purpose for findings of fact is to assist the losing party in narrowing his issues on appeal by ascertaining the true basis for the trial court's decision." *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 255 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

The findings of fact signed by the trial court provide, in relevant part, the following:

> [1-2.] Rogelio De La Paz is the first cousin of [Esequiel] and is married to Rachel De La Paz. Both individuals testified that they have a home which has all utilities connected and for which all vehicle registration, taxes and appraisals are all delivered to this house located at 124 South County Road 1055, Kingsville, Kleberg County, Texas. This home is a three-bedroom, two bath home with approximately 1,536 square feet and an appraised tax value of $52,090. This house is located in Precinct 1 in Kleberg County, Texas. They testified that they, along with their two teenaged daughters now live in a three-bedroom, one bath house that belongs to the mother of Rachel De La Paz. This house is located at 1130 East Avenue B, Kingsville, Kleberg County, Texas. The house is approximately 1,200 square feet with an appraised tax value of $33,000. Rogelio De La Paz and Rachel De La Paz testified that they, their two teenaged daughters and her parents all live in the same home, although no bills or mail are received

3

at this address. They both testified that neither of their daughters ever enrolled in school in Kingsville Independent School District. Rather from Kindergarten to eighth grade were enrolled at Ricardo Independent School District which is outside of the city limits of Kingsville, Texas [and] not in [P]recinct 4.

[3.] Margo Ann De La Paz is the daughter of [Esequiel]. She claimed her residence is with her parents at 1218 East Santa Gertrudis, Kingsville, Kleberg County, Texas as evidenced by her voter registration card. This is the residence of [Esequiel] and his wife. The evidence established she is the owner of a residence located at 25906 Mission Bluff, Boerne, Bexar County, Texas. The evidence showed that she has been the homeowner of this residence for approximately 13 years. Evidence showed that she is and has been employed in Bexar County for more than a decade. The Bourne [sic] Home is registered as her homestead.

[4-5.] Mariselda Ann De La Paz is the biological daughter of [Esequiel]. She and her boyfriend, Modesto Garza III have two teen aged daughters. She is and has been employed with Texas A&M University-Kingsville for approximately 27 years. She is a coordinator for student events at the University. She owns a house for which she pays taxes, which has connected utilities and where she testified she stays on weekends and summers. The house is located in Precinct 1 on FM Road 2619 in Kingsville, Kleberg County, Texas. This house has approximately 3,856 square feet with an appraised tax value of $167,000. She testified that she and her teenaged daughters and her boyfriend, Modesto Garza III all live at 1218 East Santa Gertrudis, Kingsville, Kleberg County, Texas. This is the residence of [Esequiel] and his wife. She testified that the four members of her family live with [Esequiel] and his wife, as well as Margo Ann De La Paz, Vanessa M. Del Bosque, and Eloy Allen Hernandez. [Esequiel's] home is approximately 1,650 square feet with four bedrooms and has an appraised value of $59,170.

[6.] Vanessa M. Del Bosque is the granddaughter of [Esequiel]. She testified that she lives with her grandfather and other family members at 1218 East Santa Gertrudis. Voter registration card introduced into evidence showed that she registered approximately one month prior to the May 22, 2018 election. Evidence established that before this change she had been living with her father at 149 East County Road 2150 in Kingsville, Kleberg County, Texas, which is located in Precinct 1. Evidence was also presented that in all elections in which she had previously voted from March 2010 through November 2016 she voted in Precinct 1. Her boyfriend is Eloy Allen Hernandez.

4

[7.] Eloy Allen Hernandez is in a relationship with Vanessa M. Del Bosque. The evidence showed that he registered to vote in December 2017. He listed his address at that time as 1216 East Santa Gertrudis, Kingsville Texas. This property is owned by [Esequiel]. Evidence [sic] presented that from August 2011 – January 2018 he was registered to vote in Kenedy County, Texas the county where his parents live. Evidence from the City of Kingsville Water Department for the address of 1216 East Santa Gertrudis, indicated the utilities for that address to be registered under the name of Carol Vela from March 1, 2016 – May 15, 2017, and under the name of Ramiro Mireles from March 12, 2018 – current. The lease agreement between the landlord and tenants of that address was introduced into evidence. Water Department documents showed the tenants did not name Mr. Hernandez or his girlfriend Vanessa M. Del Bosque as tenants.

[8.] The Court finds by clear and convincing evidence that Rogelio De La Paz, Rachel Del La Paz[,] Margo Ann De La Paz, Mariselda Ann De La Paz, Modesto Garza III, Vanessa M. Del Bosque and Eloy Allen Hernandez are not residents of Precinct 4. Their votes cast in the May 22, 2018 election were illegal. These witnesses' explanation of residence and intent were not credible.

[9.] The Court finds that the seven illegal votes changed the outcome of the election. The Court does not find by clear and convincing evidence who those seven illegal votes were cast for and thus has ordered a new election and has not declared the contestant the winner.

The conclusions of law signed by the trial court provide, in relevant part, that "[o]n the whole the evidence overwhelmingly established [Esequiel's] family and friends falsified their voter registration cards by claiming residence where they did not live and had no intention of living. Their individual and collective activities/noncredible testimony so tainted this election that another is necessary."

Esequiel requested additional or amended findings of fact, specifically requesting a finding that Gutierrez "did not prove by clear and convincing evidence that any of the challenged voters voted in the Kleberg County, Precinct 4 justice of the peace race." The record contains unsigned supplemental findings of fact that provided each of the seven

5

individuals referenced in the trial court's original factual findings "voted in the May 18, 2018 primary runoff election."   This accelerated appeal followed.

## II. DISCUSSION

In Esequiel's first issue, he contends that the election code required Gutierrez to present evidence that an illegal voter voted in the Precinct 4 JP runoff race and not merely in the runoff election in which candidates for Governor of Texas; Commissioner, Precinct 4, Kleberg County; and Precinct 4 JP squared off for their respective nominations.   In Esequiel's second issue, he contends that, under his interpretation of the election code, Guiterrez presented legally or factually insufficient evidence to support the trial court's eighth and ninth factual findings and that the legal conclusion is erroneous as a matter of law.

### A.    Standard of Review

An election contest is a special statutory proceeding that provides a remedy for elections tainted by fraud, illegality, or other irregularity.   *Blum v. Lanier*, 997 S.W.2d 259, 262 (Tex. 1999).   An election contestant, such as Gutierrez in this case, has the burden of proving by clear and convincing evidence that voting irregularities were present and that they materially affected the election's results.   *Guerra v. Garza*, 865 S.W.2d 573, 576 (Tex. App.—Corpus Christi 1993, writ dism'd w.o.j.); *Wright v. Bd. of Trustees of Tatum Indep. School Dist.*, 520 S.W.2d 787, 790 (Tex. Civ. App.—Tyler 1975, writ dism'd); *see also Rivera v. Lopez*, No. 13-14-00581-CV, 2014 WL 8843788, at *3 (Tex. App.—Corpus Christi May 14, 2014, no pet.) (mem. op.).

6

We review the trial court's judgment in an election contest for abuse of discretion. *McCurry v. Lewis*, 259 S.W.3d 369, 372 (Tex. App.—Amarillo 2008, no pet.); *see also Rivera*, 2014 WL 8843788, at *3. An abuse of discretion occurs when the trial court acts "without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *McCurry*, 259 S.W.3d at 372. If the trial court acted within its discretion, we cannot reverse the judgment simply because we might have reached a different result. *See Downer*, 701 S.W.2d at 242.

Esequiel's second issue assails the legal sufficiency of two of the trial court's factual findings.[3] In a legal sufficiency review of the evidence to support a finding that must be proved by clear and convincing evidence, we review all of the evidence in the light most favorable to the verdict—or factual finding in this case—to ascertain whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 866 (Tex. 2017). We assume that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so. *Id*. We disregard all evidence that a reasonable

---

[3] In the argument section of Esequiel's brief, he contends that the evidence is both legally and factually insufficient to support the trial court's eighth and ninth factual findings. When performing a factual sufficiency review under the clear and convincing standard, we give due consideration to the evidence that the factfinder could reasonably have found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). A factual sufficiency review also requires us to determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The distinction with a legal sufficiency review is that factual sufficiency includes disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

Under the appropriate standard of review, we must consider the entire record. Esequiel's brief fails to survey the entire record, which includes testimony from eleven witnesses and approximately 185 exhibits. Accordingly, we conclude that Esequiel's factual sufficiency challenge is inadequately briefed. *See* Tex. R. App. P. 38.1(g), (i); *see also In re J.O.A.*, 283 S.W.3d at 345.

factfinder could have disbelieved other than undisputed facts that do not support the finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

**B.      Applicable Law**

**1.      The Election Code**

"The tribunal hearing an election contest shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because illegal votes were counted."   TEX. ELEC. CODE ANN. § 221.003(a)(1) (West, Westlaw through 2017 1st C.S.).   Section 221.009 of the election code provides:

(a)      A voter who cast an illegal vote may be compelled, after the illegality has been established to the satisfaction of the tribunal hearing the contest, to disclose the name of the candidate for whom the voter voted or how the voter voted on a measure if the issue is relevant to the election contest.

(b)      If the number of illegal votes is equal to or greater than the number of votes necessary to change the outcome of an election, the tribunal may declare the election void without attempting to determine how individual voters voted.

*Id*. at § 221.009 (West, Westlaw through 2017 1st C.S.).   Section 221.009(b) expressly vests the trial court with discretion to declare an election void without attempting to determine how individual voters voted.   *Woods v. Legg*, 363 S.W.3d 710, 716 (Tex. App.—Houston [1st Dist.] 2011, no pet.).   Section 221.011 of the election code provides:

(a)      If the tribunal hearing an election contest can ascertain the candidate or side of a measure for which an illegal vote was cast, the tribunal shall subtract the vote from the official total for the candidate or side of the measure, as applicable.

(b)      If the tribunal finds that illegal votes were cast but cannot ascertain how the voters voted, the tribunal shall consider those votes in making its judgment.

8

*Id*. at § 221.011 (West, Westlaw through 2017 1st C.S.).

### 2. Esequiel's Case Law

Esequiel never mentioned the cases he relies on here to the trial court. He now cites *Miller v. Hill*, 698 S.W.2d 372, 375 (Tex. App.—Houston [14th Dist.] 1985) (per curiam), *writ dism'd w.o.j.*, 714 S.W.2d 313 (Tex. 1986), and *Medrano v. Gleinser*, 769 S.W.2d 687, 688 (Tex. App.—Corpus Christi 1989, no writ).

In *Miller*, the election contest centered on the general election race for sheriff of Brazos County, Texas. 698 S.W.2d at 373. The margin of victory was 162 votes, and the evidence at trial was principally from (1) the county's tax assessor and voter registrar concerning the existence of any records showing certain persons were registered to vote and (2) a deputy county clerk concerning signatures on the combination voters' roster and the affidavits of a challenged voter. *Id*. No voters were called to testify. *Id*. The trial court signed a judgment finding that illegal votes were cast in the general election and that such illegal votes were sufficient in number to change the outcome of the election for the office of sheriff of Brazos County. *Id*. The trial court's factual findings provided that "218 persons voted in that election who never made a valid application for a voter registration certificate in Brazos County, Texas." *Id*. The Fourteenth Court of Appeals interpreted the trial court's reference to "election" to mean the contested sheriff's election, not the entire general election ballot. *Id*. The contestee and appellant in *Miller* raised a legal sufficiency challenge to the trial court's factual finding like the one raised by Esequiel. *Id*. After surveying three statutory provisions from the election code's

predecessor, including the predecessor to section 221.009 of the election code,[4] the court wrote, "A contestant must prove:   (1) illegal votes, (2) illegal votes were cast in the election being contested, and (3) that a different and correct result would have been reached by not counting certain specified votes affected by the illegalities."   *Id*. at 375. The court provided no authority supporting its three-prong test.

The Texas Supreme Court dismissed the contestant's writ of error for want of jurisdiction.   714 S.W.2d at 315.   However, three justices dissented from the dismissal and addressed what they considered the shortcoming in the lower court's interpretation of section 221.009's predecessor.   *Id*. at 316 (J. Kilgarlin dissenting).   The dissent framed the merits-based issue as "whether [section 221.009's predecessor] requires a contestant prove that illegal votes were cast in the specific race contested or whether it is sufficient for the contestant to prove that illegal votes were cast in the general election." *Id*.   The dissent then wrote:

> The duty of a trial court under this article is clear. Instead of determining how individual voters voted in an election, a trial court may

---

[4] Section 221.009's predecessor provided:

> In an election contest or criminal proceeding in which the issue is relevant, any voter who fraudulently or illegally casts a ballot or who casts a fraudulent or illegal ballot at any general, special, or primary election may be required and compelled, after the fraud or illegality has been established by competent evidence before a tribunal of competent jurisdiction, to disclose in testimony before the tribunal having jurisdiction of the matter the name of any candidate for whom he voted and the way he voted on any question at the election.   The voter's testimony may be impeached by the testimony of other witnesses in regard to statements by the voter, either before or after the election, or by other competent evidence; and the issue of how the voter voted shall be decided on the basis of all the evidence before the tribunal.   In an election contest, instead of undertaking to determine how individual voters voted, the tribunal may declare the election void and order another election if the number of illegal votes is sufficient to change the outcome of the election. This section applies to election contests and criminal proceedings instituted under any provision of this code or under any other statute of this state.

Act of May 24, 1985, 69th Leg., R.S. ch. 211, § 1, 1985 TEX. GEN. LAW 802, 1033 (codified at TEX. ELEC. CODE ANN. § 221.009 (West, Westlaw through 2017 1st C.S.)).

> declare an election void if the number of illegal votes proved by the contestant is sufficient to have changed the outcome of the election. Under the court of appeals decision in this case, no person challenging an election can prevail without producing voter testimony. This is precisely the situation [section 221.009's predecessor] allows a trial court to avoid.
>
> The court of appeals requires a contestant produce the illegal voters at trial and get each to testify that he voted for the contestant's opponent. But what if those voters cannot be found? What if those voters are not amenable to subpoena? Even assuming they could be found and subpoenaed, what assurance do we have that they would remember for whom they voted, or if they voted in the contested race at all? How credible are we to consider persons already in violation of the law?

*Id*. at 317. The dissent's interpretation of section 221.009's predecessor as vesting the trial court with discretion to invalidate election results without requiring voter testimony complements the interpretation of the same statutory provision by the First Court of Appeals in *Woods*, 363 S.W.3d at 716.

In *Medrano*, the election contest centered on the general election race for Commissioner, Precinct 1, Goliad County, Texas. 769 S.W.2d at 687. The margin of victory was a single vote, and the evidence at trial was principally from (1) the county's voter registrar concerning several voters, including five specific voters, who cast ballots in the election but had addresses outside the boundaries of Goliad County Commissioner Precinct 1 and (2) the five specific voters who testified that they voted in the general election and in the race of Goliad County Commissioner Precinct 1. *Id*. at 688–87. While, in *Medrano* we referenced *Miller* and the specific passage Esequiel relies on in it, we did not address the issue that *Miller* addressed because of the testimony of the five specific voters. *Medrano*, 769 S.W.2d at 688–89. We did, however, discuss a question

11

of witness credibility that concerned the dissenting supreme court justices four years earlier in *Miller*. *Medrano*, 769 S.W.2d at 688–89. Specifically, we wrote:

> The factfinder is not compelled to believe uncontradicted testimony that is suspicious or that comes from an interested or biased source. If the testimony from an interested witness is of such a nature that it cannot readily be contradicted if untrue, an issue is presented as to the credibility of the witness. The same test applies when the witness shows bias.

*Id.* at 689 (citations omitted).

## C.     Analysis

Esequiel places much stock in the rule crafted in *Miller* that a contestant must prove, among other things, that illegal votes were cast in the election being contested. *See* 698 S.W.2d at 373. Esequiel's argument in support of his first issue is that the rule in *Miller* necessitates direct testimonial evidence from an illegal voter that he voted in a particular race for public office. Given the facts in this case and the relevant election code provisions, we respectfully decline Esequiel's invitation to extend the second prong in *Miller*.

First, this case is distinguishable from *Miller*. In this case the trial court heard from at least seven voters—all of whom were either relatives of or in romantic relationships with relatives of Esequiel. In *Miller*, no voters testified. *Id*. Moreover, the election contest in *Miller* involved a general election ballot, which necessarily included several other offices, as opposed to a primary runoff ballot. *Id*. at 373. Therefore, unlike *Miller*, the trial court's ability to deduce the impact on the outcome of the Precinct 4 JP runoff race, in this case, was enhanced by voter testimony and fewer offices on the entire ballot.

12

Second, our opinion in *Medrano*, 769 S.W.2d at 688, and the supreme court justice's dissenting opinion in *Miller*, 714 S.W.2d at 317 (J. Kilgarlin dissenting), explain that a factfinder may find the testimony of a witness accused of casting an illegal vote incredible or suspicious because of interest or bias. Given that the factfinder is not obligated to believe testimony it deems incredible or suspicious, we respectfully decline to read the election code as mandating that every voter accused of casting an illegal vote must disclose the specific race in which he voted. Instead, the decision to elicit and compel such testimony is best left to the parties and the trial court, respectively, to determine on a case-by-case basis as envisioned by the election code. *See* TEX. ELEC. CODE ANN. § 221.009(a) (tasking a trial court with first determining that an illegal vote was cast before compelling a voter to disclose the name of the candidate for whom the voter voted). We overrule Esequiel's first issue, as reframed.

Lastly, Esequiel's legal sufficiency challenge fails in light of the election code. In it, Esequiel implicitly posits that his seven family members identified by the trial court as casting illegal votes in the Precinct 4 JP runoff race may not have voted in that race and instead may have voted in the Democratic runoff races for governor or county commissioner. The election code provides that the trial court may void the election results if the number of illegal votes is equal to or greater than the number of votes necessary to change the outcome of an election. *Id*. at § 221.009(b). The trial court may have rejected Esequiel's implicit proposition and instead could have formed a firm belief or conviction that Esequiel's seven family members misrepresented their residency in their voter applications to vote for Esequiel as opposed to the Democratic runoff

13

candidates for governor, a statewide office, or county commissioner, whose two candidates and their affinity to Esequiel's family members, if any, are not mentioned in any of the briefs. *See Horizon Health Corp.*, 520 S.W.3d at 866. We overrule Esequiel's second issue, as reframed.

### III. CONCLUSION

The trial court's judgment is affirmed.

LETICIA HINOJOSA
Justice

Delivered and filed the
25th day of October, 2018.